IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

ELIZABETH LAMBERTON,

               Plaintiff,                    OPINION AND ORDER

    v.

                                               12-cv-009-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

               Defendant.

---

This is an action for judicial review of an adverse decision of the Commissioner of Social Security finding that Elizabeth Lamberton is not disabled, and, therefore, not eligible for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act. 42 U.S.C. § 405(g). Lamberton contends that the ALJ erred when he: (1) failed to consider Lamberton's eligibility for a listed impairment; and (2) found that Lamberton's testimony regarding her symptoms was not credible without substantial supporting evidence. Because the court agrees with Lamberton on the first point, it will reverse the Commissioner's determination and remand for further proceedings consistent with this opinion.

FACTS[1]

**A. Background and Procedural History**

Elizabeth Lamberton was born on April 28, 1976. (AR 184.) She completed school through 11th Grade, and previously worked a waitress, counter server and

---

[1] The following facts are drawn from the Administrative Record (AR), as well as from Nichols' supporting brief for summary judgment to the extent undisputed by the Commissioner.

1

assistant to handicapped children. (AR 90, 226, 230.) Lamberton first applied for Social Security Disability Insurance and Supplemental Security Income benefits on January 30, 2008, alleging a disability onset date of May 15, 2007, at the age of 31. (AR 184.)

On March 31, 2008, Disability Examiner Marisa MacLaren and Doctor of Osteopathic Medicine Syd Foster, reviewed Lamberton's medical file and found her not disabled. (AR 101-02.) On July 11, 2008, Disability Examiner Mike Evans and Doctor Bernard Stevens came to the same conclusion in response to Lamberton's request for reconsideration. (AR 103-04.)

On September 16, 2009, Administrative Law Judge ("ALJ") Sharon Turner convened a video hearing, but postponed it when Lamberton was advised of her right to counsel and requested a continuance to find an attorney. (AR 63-70.) On July 19, 2009, Administrative Law Judge ("ALJ") Milan Dostal resumed the hearing. (AR 71-100.) In a decision dated September 21, 2010, the ALJ issued a written decision, finding Nichols not disabled. (AR 10-25.) This decision became final on November 14, 2011, when the Appeals Council denied Lamberton's request for review. (AR 1.)

### B. Medical Evidence
#### i. Headache

Lamberton's medical record shows a history of recurrent migraine headaches related to tension. Lamberton was first diagnosed with this ailment on April 24, 2007, by her treating physician, Dr. Geoffrey Scott at the River Glen Medical Clinic. (AR 273.) With the medication Imitrex, the pain appeared well controlled. (AR 273). In

June of 2007, however, Lamberton reported continued headache pain and was put on 180 mg of Calan SR daily.  (AR 272.)

On August 1, 2009, Lamberton visited the Emergency Department at Moundview Memorial Hospital complaining of a "10/10" headache that had lasted for days, with a feeling of nausea and constant pressure in the back of her head and her right eye.  (AR 424-427.)  She was treated with Vicodin, scheduled for a CT scan, and then discharged.  (AR 427.)

### ii. Obesity

Lamberton has been consistently characterized as obese by her doctors.  (E.g. AR 275, 436.)  In 2007, she achieved modest weight loss by taking phentermine daily and increasing her activity, but did not keep the weight off.  (AR 270, 271, 272, 273, 275.)  On June 11, 2009, Lamberton was again motivated to lose weight and asked her treating physician, Dr. Geoffrey Scott, for a prescription to go back on phentermine.  (AR 443.)  After discussing exercise and diet changes, and noting that her osteoarthritis was stable, Dr. Scott agreed.  (AR 443.)

### iii. Knees

On August 2, 2005, Lamberton underwent arthroscopic surgery on her left knee, an operation performed by Dr. John Kroner at Orthopaedic Associates of Milwaukee.  (AR 279.)  Contrary to the indications of an earlier MRI, Dr. Kroner found that Lamberton did not have any meniscus tear, but noted an inflammation of the patella.

Kroner did some therapeutic reshaping of the patellar joint, and in September of 2005, Lamberton was enrolled in a physical therapy program. (AR 279.)

On June 12, 2007, Lamberton reported an increase in discomfort to Dr. Scott, (AR 272) and on June 29, she consulted with Dr. Kroner, complaining of front and back knee pain and aggravation from knee bending (AR 281). An MRI on June 12, 2007, showed a medial meniscus tear with some degenerative changes, mild loss of articular cartilage, and mild joint effusion. (AR 376.)

Dr. Kroner put Lamberton on a course of physical therapy and medication, noting that if these were unsuccessful, she might have to undergo another arthroscopic surgery. (AR 281.) Kroner's notes from a July 12, 2007, visit to the Moundview Hospital Rehabilitation Department state that Lamberton displayed a severely antalgic gait and hesitance to place weight on or bend her left knee. (AR 326.) Lamberton reported feeling sharp pain in her knee on that visit. (AR 331.)

On January 18, 2008, Lamberton was seen by Dr. Martin Janssen at the Roche-a-Cri Clinic for her knee pain. (AR 263.) Dr. Janssen reported that Lamberton had recently aggravated her knee injury in a fall. (AR 263.)

On March 7, 2008, she consulted with Dr. Michael Plooster at Moundview Memorial Hospital and Clinic, reporting that her knee was worse with long periods of standing or sitting. (AR 284.) Upon examination, however, her knee showed no swelling, locking, giving way or catching, and she was ambulatory with a slight limp. (AR 284-85.) Lamberton also reported that the pain was somewhat stabbing at times, but most of the time the knee was simply achy and sore. (AR284.) Dr. Plooster diagnosed

4

Lamberton with patellofemoral syndrome and pes tendinitis of the left knee, given a corticosteroid injection and Vicodin for pain, and instructed to stretch, apply moist heat, massage and return for a follow up visit if her symptoms did not improve.  (AR 285.)

On April 4, 2008, Lamberton was seen again by Dr. Plooster.  (AR 402.)  She stated that the corticosteroid injection she received on her last visit was not very helpful and that she continued to have swelling, knee collapse and the need of a cane.  (AR 402.)  Moreover, her physical therapy had not produced an improvement.  (AR 402.)  Because of her ongoing complaints and a lack of improvement, Plooster recommended her for further surgery.  (AR 402.)  On May 9, 2008, Plooster performed an arthroscopy with chondroplasty (removal and sculpting of the cartilage) of the patellofemoral joint, and a partial synovectomy (surgical removal of part of the synovial membrane).  (AR 377-378.)  Lamberton was discharged with prescriptions for crutches and painkillers.  (AR 369, 382.)

It is unclear what short-term effect this additional surgery had, but in June and August of 2009, Lamberton was back to her treating physician, Dr. Geoffrey Scott, complaining of continued, severe osteoarthritis of the knees bilaterally.  (AR 442-43.)

    iv.    Depression/Anxiety

Lamberton's first documented symptoms of depression are found in Dr. Scott's report from her February 1, 2007, visit to Columbia St. Mary's River Glen Medical Clinic.  (AR 275.)  Lamberton presented as tearful and crying, and stated that a friend had been taking care of her children for part of the last month because she was psychologically unable to do so.  (AR 275.)  Dr. Scott recommended that Lamberton

continue to take Zoloft, noting that with regular medication her depression should stabilize. (AR 273, 275.) Through that spring, Lamberton continued to report insomnia and depression despite medication. (AR 272, 273.)

On November 5, 2007, Lamberton saw Dr. Mark Hatton for her depression. (AR 258.) Lamberton reported that in October of 2007 she ran out of Zoloft and Trazodone, did not refill her prescription, and as a result had been feeling worse. (AR 258.) Dr. Hatton noted that Lamberton had a history of taking herself off of her depression medication and switched her from Zoloft to fluoxetine in the hope that this medication would be more effective. (AR 258.) One month later, Lamberton reported an improvement in her mood, ambition and concentration, and decreased crying. (AR 257.)

In response to Lamberton's disability application, on March 31, 2008, Jack Spear, Ph.D., a state agency psychological consultant, evaluated her medical file and completed a psychiatric review technique form. (AR 345.) He concluded that Lamberton had an affective disorder characterized by disturbance of mood and sleep, decreased energy and difficulty concentrating and thinking. (AR 348.) She did not, however, have a "severe" impairment. (AR 345.) Her restrictions on activities of daily living, difficulties in maintaining social functioning, and limitations on concentration, persistence or pace were all "mild" and she appeared to suffer no episodes of decompensation. (AR 355.)

On October 30, 2009, Lamberton came in to see Dr. Scott again about her depression, which had become worse with the advent of certain martial and employment issues. (AR 441.) Dr. Scott restarted Lamberton's prescription for Zoloft for depression and Xanax for anxiety. (AR 441.) On November 15, 2009, Dr. Scott noted Lamberton's

"longstanding history of anxiety and depression," which had been exacerbated by a recent increase in her stress. (AR 439.) Lamberton reported that she had missed work for the past two weeks, and Dr. Scott gave her a work excuse, but noted that if she needed more time off she would need the opinion of a psychiatrist. (AR 439.) Lamberton reported plans to see a psychiatrist, but also stated that she was pleased with the efficacy of Trazodone, Zoloft and Xanax, causing Dr. Scott to note that her anxiety appeared stable. (AR 439.)

On January 26, 2010 Lamberton was seen by a therapist, Dr. Thomas Charles at the Adams County Health and Human Services Department. (AR 453.) Lamberton gave a detailed description of her history of depression and her current life stressors. (AR 453-56.) She explained that she had been working on and off for the past fifteen years, and that she had been able to work at the HoChunk casino from April 2009 until October 2009 but was fired when she took time off. (AR 464.) Dr. Charles diagnosed her with major depressive disorder and a panic disorder with a score of 60/100 in her global assessment of psychological, social and occupational functioning. (AR459.)

On March 24, 2010, Lamberton saw Dr. Charles a second time and reported feeling overwhelmed with the difficulties stemming from her health problems and her husband's drinking and abusiveness. (AR 472.) That same day, Lamberton saw Dr. Randal Cullen for a disability evaluation. (AR 473.) Dr. Cullen initially noted that Lamberton had a history of mild depression, reported "no acute concerns particularly" and had stopped taking Xanax regularly, but ultimately diagnosed Lamberton with major depression (of moderate severity and in partial remission) and anxiety disorder. (AR

7

473.)  Cullen gave Lamberton a score of 65/100 in her global assessment of psychological, social and occupational functioning.  (AR473.)  Lamberton saw Dr. Cullen again on May 11, 2010.  At that time, Lamberton reported that she was "doing fairly well" on a regimen of sertraline, Zoloft and occasional benzodiazepine.  (AR 471.)

Lamberton continued to see Dr. Charles for therapy through the spring and summer of 2010.  On July 15, 2010, Dr. Charles filled out a mental impairment questionnaire diagnosing her with moderately severe major depression, with symptoms intensified by her family circumstances.  (AR 477.)  Although her prognosis was "good" (AR 477), Charles noted her "limited but satisfactory" ability to understand and remember work procedures and instructions, maintain attention, maintain regular attendance, and interact with the public using socially appropriate behaviors.  (AR 481.)  Charles opined that Lamberton would experience one or two episodes of decompensation within a tow week to four week period and on average would miss more than four days per month due to her psychological impairments.  (AR 485-86.)

### C. Administrative Law Judge's Decision

After considering the documentary evidence and testimony, the ALJ issued a written decision on September 21, 2010, that found Lamberton was *not* disabled under the Social Security Act's sequential five-step analysis.  *See* 20 C.F.R. §§ 404.1520.  At step one, the ALJ found that Lamberton had not engaged in substantial gainful employment since May 15, 2007, the alleged onset date of disability.  (AR 15.)  At step two, the ALJ found that Lamberton had three severe impairments: history of a left knee meniscus tear; obesity; and depression.  (AR 15.)  At step three, the ALJ found that none

of Lamberton's severe impairments were listed in 20 C.F.R. 404, Subpart P, Appendix 1, and that individually and in combination her impairments were not the equivalent of any of the listed impairments.[2]  (AR 15.)

After completing step three, the ALJ turned to assessing Lamberton's Residual Functional Capacity by considering the level of work activities that she could perform on a sustained basis despite the limitations posed by her impairments.  (AR 16.)  The ALJ determined that Lamberton was capable of light work as defined in 20 C.F.R. § 404.1567(b) with certain restrictions described in the second hypothetical he propounded to the vocational expert.  (AR 16.)

In reaching this conclusion, the ALJ rejected Lamberton's testimony about the severity of her symptoms.  Although the ALJ found that Lamberton's medical impairments could reasonably be expected to produce her claimed symptoms, he did not credit Lamberton's complaints regarding the severity and intensity of those symptoms, and found that the supporting statements by her physicians regarding her symptoms were not well-substantiated by the medical evidence.  (AR 16-17.)

At step four, the ALJ compared his residual functional capacity determination with the requirements imposed by Lamberton's past work, concluding that Lamberton would be able to work either of her past jobs as a counter attendant and waitress as generically defined.  (AR 20.)  The ALJ mentioned the testimony of Vocational Expert Susan Allison, who stated that according to the *Dictionary of Occupational Titles*, "counter attendant" and "waitress" were unskilled or semi-skilled and required light work capacity

---

[2] The ALJ provided no specific discussion or explanation for his finding at stage three.

at most. (AR 20.) The ALJ adopted Allison's finding that an individual with the limitations in the ALJ's second hypothetical could perform either of these two jobs. (AR 20.)

OPINION

The court is tasked with deciding whether the Commissioner's final decision is "both supported by substantial evidence and based on the proper legal criteria." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Lamberton's identifies two errors on appeal. *First*, the ALJ failed to properly consider whether she qualified for Listing 1.02A. *Second,* the ALJ did not give proper weight to the evidence in making a credibility finding. The court will consider each in turn.

I.  **Failure to Consider Listing 1.02A**

Listing 1.02A provides in pertinent part:

> **Listing 1.02 Major Dysfunction of a Joint(s) (due to any cause):** Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A.   Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in §1.00B2b; . . . .

20 C.F.R. Part 404, Subpt. P, App. 1, Listing 1.02.

Listing 1.02A contains a reference to Listing 1.00B2b, which defines "ability to ambulate effectively," as follows:

> **b. What We Mean by Inability to Ambulate Effectively**
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not

11

> limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing 1.00B2b.

The Commissioner concedes that the ALJ did not spend any time analyzing whether Lamberton's knee condition meets or equals this listing or any other. The Commissioner further concedes that this was legal error because the regulations state that "[i]f your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal." 20 C.F.R. 404.1526(b). Nevertheless, the Commissioner argues that this was harmless error because Lamberton did not meet her burden of presenting even a prima facie case that she met or equaled the listing. See *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("Ribaudo has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing.").

Listing 1.02A has four discrete requirements for someone in Lamberton's situation: (1) a gross anatomical deformity of at least one major peripheral weight-bearing joint (i.e., hip, knee, or ankle); (2) chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s); (3) findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or

12

ankylosis of the affected joint(s); and (4) a resulting inability to ambulate, which means inability to walk without a two-handed ambulatory aid, or sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 1.00B2b; 1.02(A). Conceding that the medical record contains evidence of the first three elements of the listing, the Commissioner argues that Lamberton produced no cognizable evidence of the fourth part of the listing -- the inability to ambulate.

Lamberton testified that she has difficulty walking for any significant distance even with a cane, and that her therapist recommended (she did not use the word "prescribed") the cane, but the Commissioner maintains this evidence is legally insufficient. Instead, the Commissioner argues that Lamberton was required to produce "objective medical findings" regarding Lamberton's inability to ambulate, presumably in the form of a functional capacity evaluation or similar assessment. The principal dispute between the parties over the possible application of Listing 1.02A turns, therefore, on whether Lamberton needed to present relevant *medical evidence* to have any chance of satisfying this Listing criterion, or whether she met her burden with lay testimony.

The Commissioner maintains medical evidence is needed as a matter of law, and finds at least indirect support in the regulations, which state that the ALJ must "compare the symptoms, signs and laboratory findings about your impairment(s), as shown in the *medical evidence* we have about your claim, with the *medical criteria* shown with the listed impairment." 20 C.F.R. § 404.1526(b). This same standard is echoed in *Sullivan v. Zebley*, 493 U.S. 521 (1990), in which the Supreme Court broadly described the Step 3

procedure for determining whether an impairment meets or equals a listing, using language suggesting that medical evidence may be required: "[e]ach impairment is defined in terms of several *specific medical signs, symptoms, or laboratory test results*," and emphasized that "[a]n impairment 'meets' a listed condition . . . only when it manifests the specific findings described in *the set of medical criteria* for that listed impairment." *Id.* at 530-31 (emphasis added).

Notwithstanding this language, Lamberton counters that it would be illogical to require a *medical* opinion to establish facts to which any lay person can testify; in this case, the ability of the applicant to ambulate with and without the assistance of certain physical aids. Conceding that most listing criteria, which speak in terms of technical diagnoses that can be performed only with tests and knowledge requiring a medical expertise, Lamberton argues that the definition of "ability to ambulate" is somewhat unique in its amenability to proof through lay testimony. While Lamberton cites no supporting case-law, the logic of her argument has some force.

The court need not decide at this juncture whether there is a strict, legal requirement that every listing criterion be proved with medical, as opposed to lay, evidence. Whether or not Lamberton could legally have prevailed on the submitted evidence, she did enough to require that the ALJ at least address the possible application of Listing 1.02A in light of the combination of medical evidence and lay testimony that together suggest the listing criteria could be met. If the ALJ believed that this evidence was technically inadequate, he should at least have further developed the record by asking for a medical opinion as to the extent of her ability to walk. *See Smith v. Apfel*, 231

F.3d 433, 437 (7th Cir. 2000) (holding that "failure to [develop the record] is 'good cause' to remand for gathering of additional evidence"); *see also Richards v. Astrue*, 370 F. App'x. 727, 731 (7th Cir. 2010) ("[A]n ALJ may not draw conclusions based on an undeveloped record and has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible").

The Commissioner takes pains to point out that the ALJ dealt with Lamberton's lay testimony later in his opinion, acknowledging testimony about her ability to walk and explained why he found the testimony not credible, but the court harbors doubts about the soundness of his analysis, which attempts to leverage Lamberton's ability to work in *2009* as a justification for discounting her testimony about her inability to walk in *2012*. Moreover, the court's attempt to apply the ALJ's rejection of Lamberton's testimony to the Listing context is frustrated by the Commissioner's failure to address the issue at the proper stage. Notwithstanding the Commissioner's attempt to explain why the ALJ's other findings render a particular omission harmless error, *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010), the five-step framework exists for a reason, and the court is less than convinced by the Commissioner's efforts to explain why findings specific to step 4 mean that no analysis was needed at step 3. Accord *Scott v. Barnhart*, 297 F.3d 589, 596 (7th Cir. 2002) ("We have repeatedly admonished ALJ's to 'sufficiently articulate [their] assessment of the evidence to assure us that [they] considered the important evidence and to enable us to trace the path of [their] reasoning.'").

**II. Flawed Credibility Findings**

The second contention of error put forward by Lamberton concerns the ALJ's credibility assessment in determining her residual functional capacity. Lamberton contends that the ALJ erred when he wrote that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent inconsistent with the above residual functional capacity assessment." Her first criticism goes not to the ALJ's reasoning, but rather to his use of a standard opinion template commonly found in other ALJ opinions. This portion of the template has been called "useless boilerplate" by the Seventh Circuit Court of Appeals, *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010), and has been criticized for suggesting "that ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

Still, the ALJ's use of the template language is not a valid reason to remand by itself. While the language could certainly use some updating to address the Seventh Circuit's criticisms, this court is not confused by it and understands from the record as a whole that the ALJ, has in fact, considered the applicant's credibility before making a functional capacity determination.

Lamberton also argues that the ALJ erred in his substantive analysis of the record. In his decision, the ALJ wrote:

> One factor affecting the claimant's credibility is her treatment history. The claimant has records detailing her course of treatment from February 2007 through March 2010, which document that her impairments and pain symptoms are well controlled with medications and other treatments. (Exhibit 16F/9). She admitted to her treating physician that she had

>not been compliant with her prescribed medications and other treatment. Therefore the undersigned finds the claimant's credibility is diminished.

(AR 19.) Lamberton argues that it was error to rely on her patchy record of complying with treatment because "people with serious psychiatric problems are often incapable of taking their prescribed medications." (Dkt. #13 at 28 (quoting *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011)). This is especially true for people with bipolar disorder who stop taking medication during manic episodes. *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).

While this phenomenon may be generally recognized, however, it is not obviously applicable to Lamberton in particular, having failed to identify a diagnosis of bipolar disorder in the record, or any notes from any treatment provider stating that her noncompliance with treatment is attributable to her mental illness. Under the circumstances, it was not error to make a credibility determination at least in part in reliance upon Lamberton's admitted failure to take her medication.

Lamberton similarly criticizes the ALJ for concluding that her representations of disabling knee pain are unconvincing in light of her six months of work as a counter attendant in 2009, without asking follow-up questions about this work. (AR 19.) Lamberton cites *Shauger v. Astrue*, 675 F.3d 690, 698 (7th Cir. 2012), for the proposition that a credibility finding is suspect and cannot stand when the ALJ bases a credibility finding on facts that he did not fully develop. Certainly, the ALJ in a Social Security hearing has a duty to develop a full and fair record. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). However, the court finds that the ALJ did an adequate job in this

regard, particularly after giving Lamberton's counsel full opportunity to develop the record on this point. (AR 80-87, 91-92). *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (when a claimant is unrepresented, the ALJ's duty to develop the record is enhanced).

Lamberton more specifically argues that the ALJ failed to inquire about: (1) whether Lamberton stood or sat at her job; and (2) whether "[s]itting for most of a work day would not be inconsistent with Lamberton's testimony as to her lack of ability to stand or to ambulate without a cane." In truth, Lamberton specifically testified to being "on my feet all day long." (AR 91.) Lamberton also objects that "nothing in the record supports the finding that the claimant was working 12 hours per day in 2009." This, too, is untrue, since contemporaneous medical records include such statements by Lamberton as reported to her physicians. Given the incentive of any patient to report his condition accurately to a treating physician, these would seem trustworthy statements even if not made against interest. *See* Fed. R. Evid. 801(d)(2) (opposing party's statement), & 803(3) (statement made for medical diagnosis or treatment). Accordingly, the ALJ reasonably relied on the records as proof of Lamberton's abilities. Moreover, as this evidence largely directly and comprehensively contradicts Lamberton's statements about her ability to walk, the ALJ's credibility determination was supported by substantial evidence, at least as to Lamberton's residual functional capacity in 2009.[3]

---

[3] Earlier, the court has noted its disapproval of the ALJ's decision to use Lamberton's work history in 2009 as the sole basis for judging Lamberton's testimony about the severity of her knee condition in 2012, but this does not mean it constitutes *no* evidence.

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Elizabeth Lamberton's application for disability insurance benefits is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment in favor of the plaintiff and close this case.

Entered this 22nd day of August, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge